## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PAUL HOTARD** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-1877** |
| **AVONDALE INDUSTRIES, INC. ET AL** | **SECTION "L" (1)** |

## ORDER AND REASONS

Before the Court is SeaRiver Maritime, Inc.'s motion for summary judgment, in which Exxon Mobil Corporation joins, R. Doc. 325, and which Plaintiff opposes, R. Doc. 356. SeaRiver Maritime, Inc. filed a reply. R. Doc. 369. Following oral argument, the parties provided additional briefing and exhibits to address questions raised by the Court. R. Doc. 397, 399, 399-1 (Plaintiff's supplemental briefing); R. Doc. 405 (SeaRiver Maritime, Inc.'s supplemental briefing). Considering the parties' briefs, the oral argument of counsel, the record, and the applicable law, the Court now rules as follows.

### I.   BACKGROUND

This litigation arises from decedent Paul Hotard's ("Decedent's") alleged exposure to injurious levels of asbestos and asbestos-containing products designed, manufactured, sold and/or supplied by several Defendant companies while Mr. Hotard was employed by Defendant Huntington Ingalls Inc., formerly known as Avondale Industries, Inc. and Avondale Shipyards, Inc., ("Avondale") at the Main Yard of Avondale Shipyards. R. Doc. 1-2 at 2; R. Doc. 60. Decedent worked at Avondale Shipyards from September 2, 1969 to March 27, 1970 as a pipefitter's helper and tack welder. R. Doc. 166-2 at 1; R. Doc. 181-1 at 1. His duties consisted

1

of handing pipe to the pipefitter so that it could be installed and tacking the pipe together for the welder to weld.

During his employment with Avondale, Decedent never handled or used asbestos or asbestos-containing materials himself. *Id.* However, Decedent allegedly inhaled asbestos fibers at Avondale Shipyards while working on the construction of vessels. Decedent allegedly worked near insulation and wallboard materials that are known to contain asbestos. R. Doc. 356 at 2. Decedent's occupational exposure to asbestos-containing materials allegedly caused him to develop diffuse malignant pleural mesothelioma. He was diagnosed with the disease in or around April 2020. R. Doc. 1-2 at 3; R. Doc. 166-2 at 2; R. Doc. 181-1 at 2.

In June 2020, Mr. Hotard, a citizen of Kentucky, brought Louisiana state law negligence and strict liability tort claims against various Defendants in the Civil District Court for the Parish of Orleans. R. Doc. 1-2. Defendant Avondale removed the case to federal court on the basis of diversity jurisdiction. The matter was originally assigned to Chief Judge Brown.

During the pendency of this litigation, on or about September 21, 2021, Paul Hotard died allegedly as a result of malignant mesothelioma. R. Doc. 233. Mr. Hotard's widow, Patricia Hotard, was substituted in his place as Plaintiff, R. Doc. 226, and filed an amended complaint as the independent administratrix of Decedent's estate. R. Doc. 233.

On February 15, 2022, Chief Judge Brown recused herself. R. Doc. 304. The matter was reallotted to this Section. R. Docs. 304-06.

## II.     PENDING MOTION - SeaRiver's Motion for Summary Judgment, R. Doc. 325

Defendant SeaRiver Maritime, Inc. ("SeaRiver") moves for summary judgment

dismissing all claims asserted against it by Plaintiff.[1] R. Doc. 325. SeaRiver[2] owned three Super Tankers that were constructed by Defendant Avondale at its Avondale Shipyards facility at the time Avondale employed Mr. Hotard. During his deposition, Mr. Hotard recalled working on at least one of those Super Tankers.

SeaRiver makes two main arguments in its motion. First, SeaRiver contends that Plaintiff's negligence claims against it fail because it did not have a duty to warn Decedent, an Avondale employee, of risks inherent to his job as it neither controlled Decedent's work nor the Avondale worksite. *Id.* at 2. Second, SeaRiver argues that Plaintiff's strict liability claim is unavailing because it did not have *garde* or legal control over Decedent's worksite at Avondale Shipyards; rather, SeaRiver contends that Avondale had custody over the premises where Decedent worked during the pertinent period. *Id.* Defendant Exxon Mobil Corporation ("Exxon") joins in SeaRiver's motion. R. Doc. 325-2 at n.33.

In opposition, Plaintiff contends that it has raised a fact issue as to whether Defendants Exxon and SeaRiver (collectively, "E&S") were negligent under theories of direct and vicarious liability. R. Doc. 356 at 7-8. Regarding direct liability, Plaintiff argues that E&S failed to warn Decedent of the dangers of asbestos despite its awareness that such a hazard was inherent to constructing ships in accordance with E&S's design. *Id.* And because E&S allegedly knew of the dangers of asbestos but failed to warn Decedent, Plaintiff claims that it has created a jury issue

---

[1] Although the motion was filed subsequent to Decedent's passing and the substitution of Patricia Hotard as Plaintiff, the motion incorrectly refers to Decedent as the Plaintiff. The Court treats the motion as applying to Patricia Hotard, who is the proper Plaintiff.

[2] SeaRiver asserts that it is the successor to Humble Oil & Refining Company. R. Doc. 325-1 at 2. And earlier Exxon Mobil Corporation—which is represented by the same counsel as SeaRiver—argued that SeaRiver, not it, was the proper party for claims stemming from the actions or inactions of Humble Oil & Refining Company. R. Doc. 323. But Exxon later withdrew its motion. R. Doc. 393. For the sake of simplicity, the Court refers to both Exxon Mobil Corporation and SeaRiver as the owners of the Super Tankers, although Humble Oil & Refining Company, in fact, owned these vessels at the time Decedent worked for Avondale.

on whether E&S are vicariously liable. *Id.* at 8-10. Last, Plaintiff argues that she has raised a genuine issue of fact as to whether E&S, as the owners of the Super Tankers, constitute premises owners who may be held strictly liable for the asbestos exposure Decedent allegedly suffered while working on the vessels. *Id.* Specifically, Plaintiff asserts that she has offered evidence that Decedent worked on the vessels after they were delivered to the custody and control of E&S. *Id.* at 3.[3]

### III.   LEGAL STANDARD

#### A.  Summary Judgment Standard

Summary judgment is proper if the pleadings and the evidence gathered in discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

"A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When ruling on a motion for

---

[3] Plaintiff's briefing refers to SeaRiver and Exxon collectively because "most arguments in this matter" apply to both entities. R. Doc. 356. Accordingly, the Court will also refer to the parties collectively where appropriate.

summary judgment, a court may not resolve credibility issues or weigh evidence. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Moreover, the court must assess the evidence and "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). However, "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence" are not sufficient to show a genuine dispute of material fact. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## IV.   DISCUSSION

E&S argue that they are entitled to summary judgment on Plaintiff's claims asserted against them. Those claims sound in negligence and strict liability. E&S contend that they (1) were not negligent because they did not owe a duty to provide a safe workplace to Avondale employees like Decedent or to warn them of workplace hazards and (2) cannot be strictly liable for a vessel that was constructed on Avondale's premises when the vessel was, at all relevant times, in the care, custody, and control of Avondale. R. Doc. 325-2 at 2. Before analyzing these arguments, the Court reviews the facts pertinent to E&S's motion.

Decedent was employed by Avondale from September 2, 1969 to March 27, 1970. R. Doc. 325-4 at 91. Decedent worked solely on the Main Yard of Avondale Shipyards in Bridge City, Louisiana. *Id.* He testified at his deposition that he worked on an "Exxon" ship during his period of employment with Avondale. R. Doc. 325-1 at 1. Exxon, which is the corporate parent of SeaRiver, did not come into existence as a corporate entity until 1972—two years after Decedent's employment with Avondale terminated. However, Humble, Exxon's predecessor, contracted with Avondale for the construction of three Super Tankers ("the Vessels") from 1967-

5

1971. The Vessels were named the ESSO SAN FRANCISCO, the ESSO BATON ROUGE, and the ESSO PHILADELPHIA. *Id.* at 1-2. Pursuant to the contracts between Humble and Avondale for the Vessels ("the Vessel Contracts"), the Vessels were constructed at Avondale Shipyards. The contracts also expressly provided that Avondale was an "independent contractor" with "all responsibility" for the Vessels until delivery. R. Doc. 325-2 at 4. And under the terms of the Vessel Contracts, the Vessels would not be delivered into Humble's possession until they were completed, ready for service, and had passed all required tests and been certificated. *Id.* at 2. The Vessel Contracts further provided that delivery was to occur "at Contractor's Shipyard." *Id.* at 4.

At his deposition, Decedent testified that he received all his tools, training, and supervision in connection with his work at Avondale Shipyards from Avondale. *Id.* Regarding his work on the Vessels, Decedent remembered working on only one "Exxon" ship and stated that it was "[p]robably" the ESSO SAN FRANCISCO after his counsel showed him an excerpt from his medical file at Avondale concerning an injury he sustained on that vessel on October 15, 1969. *Id.* at 3. Decedent testified that any work he performed on "Exxon" vessels was performed on the ship's hull. Mr. Hotard also stated that he did not work on any "Exxon" vessel while it was in the water or after it was "launched." R. Doc. 325-1 at 4; R. Do. 325-4 at 93, 99; R. Doc. 356-1 at 3.

As noted, Mr. Hotard ceased employment with Avondale on March 27, 1970. Humble memorialized the delivery of the Vessels in Certificates of Delivery. According to these documents, the Vessels were delivered by Avondale to Humble on the following dates: ESSO SAN FRANCISCO – December 12, 1969; ESSO Baton Rouge – March 25, 1970; ESSO PHILADELPHIA – June 18, 1970. *Id.* Records indicate that Avondale employees performed certain work aboard the ESSO SAN FRANCISCO and the ESSO BATON ROUGE after they

were delivered to Humble. But given that Hotard left Avondale on March 27, 1970, he could not have worked on the ESSO BATON ROUGE past that date—which was two days after its delivery—and could not have performed any worked on the ESSO PHILADELPHIA following its delivery, which was several months after Decedent left Avondale's employ.

Plaintiff acknowledges that Decedent did not work directly with asbestos-containing materials. R. Doc. 356 at 1. Rather, Plaintiff contends that Decedent was exposed to asbestos because he worked in proximity to the employees of Hopeman Brothers, Inc. ("Hopeman"), one of Avondale's subcontractors. *Id.* at 2. Hopeman employees cut and installed insulation and wallboard inside vessels that were under construction. The insulation and wallboard materials allegedly contained asbestos, and the cutting of these materials by Hopeman's employees purportedly caused asbestos dust to enter the air. Mr. Hotard allegedly inhaled this asbestos-containing dust, which caused his mesothelioma. *Id.* at 2.

With this background in mind, the Court reviews in turn E&S's arguments that it is entitled to summary judgment on Plaintiff's negligence and strict liability claims.

### A. Negligence

Under Louisiana Civil Code article 2315, a plaintiff must prove five elements to establish liability for a negligence claim: "(1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages." *S.J. v. Lafayette Parish Sch. Bd.*, 2009-2195 (La. 7/6/10), 41 So.3d 1119, 1125 (citing *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217, p. 6 (La. 4/3/02), 816 So.2d 270, 275–76). E&S argue summary judgment is due because no genuine

issue of material fact exists with respect to the duty prong of Plaintiff's negligence claims. Whether a duty exists is a question of law. *Chavez v. Nobel Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978).

### 1. Duty

In certain circumstances, a premises owner may be held vicariously liable for the acts of an independent contractor or directly liable for its own negligent acts. *Thomas v. A.P. Green Indus., Inc.*, 2005-1064 (La. App. 4 Cir. 5/31/06), 933 So.2d 843, 851. Before considering these theories of negligence, however, the Court notes that they only apply where a defendant is a *premises owner*. E&S contend that they cannot be deemed a premises owner for two reasons. First, they argue that Avondale was the premises owner because Decedent was employed at Avondale Shipyards. R. Doc. 325-2 at 2. Second, E&S assert that the Vessels were not complete and therefore were not yet a "premises" at the time Mr. Hotard worked on them. R. Doc. 368 at 7.

The Court is not persuaded by E&S's arguments. Although Avondale employed Decedent, he testified that he was exposed to asbestos while working in the hull of an under-construction "Exxon" vessel while it was at Avondale Shipyards. *E.g.* R. Doc. 325-4 at 96-97, 104, 189, 192. And under the Vessel Contracts, the Vessels were to be "deemed to become the property of Purchaser [Humble] at the same moment they arrive at Contractor's [Avondale's] works," even before "the actual transfer of possession to Purchaser." *E.g.*, R. Doc. 325-7 at 32. Moreover, E&S cite no authority for the proposition that merely because a thing is unfinished or under-construction, it cannot qualify as a premises. To the contrary, even though the Vessels were incomplete, they were nevertheless a premises, and therefore must have had a legal owner. *See Sanders v. Woodlawn Cemetery, Inc.*, 2020-398 (La. App. 3 Cir. 2/3/21), 311 So. 3d 496,

502 (discussing claims against the owner of a premises that was under construction).

In sum, Decedent testified that he was working on a vessel that may have been owned by Humble—E&S's corporate predecessor—and the Vessel Contracts provide that the Vessels were the property of Humble even before their delivery to Humble. Viewing the facts in the light most favorable to the Plaintiff as nonmovant, a fact issue exists as to whether E&S were the premises owner of the Vessels when Decedent was allegedly was exposed to asbestos while working on any of them.

The Court must then consider whether summary judgment is proper on each negligence theory—vicarious and direct liability.

### i. Vicarious Liability

Generally, a principal is not vicariously liable for the negligence of an independent contractor. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987). However, this rule—often termed the independent-contractor defense—is subject to two exceptions that are relevant here. First, a principal may be liable where it exercises "operational control" over the independent contractor's performance. *Id.* Second, vicarious liability may be imposed where the premises owner expressly or impliedly approved a contractor's unsafe work practice that caused the injury.[4] *Id.*

Under the first exception, E&S contend that they lacked operational control over the work performed by Avondale. Furthermore, E&S argue that there is no evidence that they

---

[4] As this Court has previously noted, it is unclear whether this is a second, independent requirement, or part of the inquiry into operational control. *See Lopez v. McDermott, Inc.*, No. CV 17-8977, 2020 WL 3668059, at *5 (E.D. La. July 6, 2020) (citing *Sandbom v. BASF Wyandotte, Corp.*, 95-0335 (La. App. 1 Cir. 4/30/96), 674 So.2d 349, 357). For the sake of clarity, the Court addresses it separately here. Additionally, a principal may be liable for the negligence of its independent contractor where the independent contractor engages in ultrahazardous activity but that exception is not relevant here. *Ainsworth*, 829 F.2d at 550.

retained control over the work of Avondale's subcontractor, Hopeman, which allegedly was the source of the asbestos to which Mr. Hotard was exposed. R. Doc. 368 at 7-8.

"Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003) (holding that no operational control existed where the independent contractor was "exclusively responsible for controlling the details" of the work's performance despite the on-site presence of the principal's representatives).

"When the contract assigns the independent contractor responsibility for its own activities, the principal does not retain operational control." *McDaniel v. R.J.'s Transp., L.L.C.,* 53,667 (La. App. 2 Cir. 1/13/21), 310 So. 3d 760, 764; *see also LeJeune v. Shell Oil Co*., 950 F.2d 267, 269 (5th Cir. 1992) ("[W]e have frequently noted that, under Louisiana law, 'the relationship between the principal and the independent contractor is in large measure determined by the terms of the contract itself.'" (quoting *Duplantis v. Shell,* 948 F.2d 187, 193 (5th Cir. 1991)). Here, the unambiguous language of the Vessel Contracts refers to Avondale as an "independent contractor," thus establishing a contractual principal-independent contractor relationship.

But the terms of the contract are not dispositive. The Court must also consider whether E&S "retained any *actual* operational control over" Avondale. *See McDaniel*, 310 So. 3d at 764. Instructive on this point is this Court's decision in *Lopez v. McDermott, Inc.*, No. CV 17-8977, 2020 WL 3668059, at *5 (E.D. La. July 6, 2020). There, a contractor employed a welder and assigned him to work on various offshore drilling platforms, including several owned by defendant Exxon. The worker testified that he "was always under the direct supervision" of the

contractor's foreman and that Exxon did not provide any direct supervision. *Id.* The contractor also provided the worker with all the training, safety instructions, and tools and materials for the job. *Id.* And even though Exxon had inspectors on the premises, they were "inspecting the progress of the end product rather than telling [the worker] how to weld." *Id.* (internal quotation marks omitted). *Id.* Thus, this Court concluded that Exxon did not have operational control over the performance of the contractor's employees. *Id.* Further, in *Lopez*, the potentially dangerous condition was created by the independent contractor.

Analogous to the relationship between the welder and his employer in *Lopez*, Decedent here received all his tools, training, and supervision for his work on an "Exxon" vessel from Avondale, his employer. R. Doc. 325-1 at 2. And there is no evidence that E&S provided step-by-step instruction or direction to Avondale employees on the performance of their work. Accordingly, based on the summary judgment evidence, E&S did not have operational control over Avondale employees. *See Lopez*, No. CV 17-8977, 2020 WL 3668059, at *5; *see also Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997) (finding no operational control despite the principals' reservation of rights to monitor the contractor's performance, station a company man on the premises to observe the activities, and make safety recommendations).[5]

Nonetheless, E&S may still have owed a duty to Mr. Hotard if they expressly or impliedly authorized unsafe work practices by Avondale or Hopeman that caused Decedent's workplace exposure to asbestos and resultant mesothelioma.[6] *See Ainsworth*, 829 F.2d at 550;

---

[5] Plaintiff does not argue that E&S exercised operational control over Hopeman, the subcontractor whose work allegedly exposed Mr. Hotard to asbestos. Thus, this Court need not address E&S's argument that they could not have owed a duty to protect Mr. Hotard under a theory of vicarious liability because they did not maintain control over Hopeman.

[6] E&S point to several cases holding that the mere "giving of specifications and the demand that certain standards be met is insufficient to hold that a principal has retained the right to exercise operational control." *Haynie v. Dynamic Offshore Contractors, Inc.*, No. CIV. A. 89-4552, 1991 WL 33615, at *1 (E.D. La. Mar. 7, 1991); *accord Romero v. Mobil Expl.*, 727 F. Supp. 293, 295 (W.D. La. 1989). This proposition is certainly true as far as it goes. But it does not apply where the principal authorizes an unsafe work practice.

*accord Smith v. State Farm Ins. Co.,* 2006-826 (La. App. 3 Cir. 12/6/06), 944 So.2d 811, 813;

*Williams v. Gervais F. Favrot Co.,* 499 So.2d 623, 625 (La. App. 4 Cir.1986). Plaintiff asserts

that, at time Decedent was working on the Vessels, Exxon[7] was aware of the dangers posed by

asbestos but that it nevertheless commissioned ships whose construction required using asbestos.

R. Doc. 356 at 8-9.[8] Under these circumstances, Plaintiff asserts that E&S owed a duty to warn

Mr. Hotard of the risks of asbestos exposure.

     A principal's mere knowledge of an unsafe work condition is not sufficient to impose

upon it a duty to notify its contractor's employees of hazards attendant to their work. *See*

*Ainsworth*, 829 F.2d 551 (offshore platform owner that hired an independent contractor not

under duty to correct a hazard where contractor's employee was injured due to lack of lighting

and contractor was responsible for lighting the work area); *see also Roach v. Air Liquide Am.*,

No. CV 2:12-3165, 2016 WL 1453074, at *4 (W.D. La. Apr. 11, 2016) (defendant premises

owner did not have a duty to the employee of an independent contractor who performed

sandblasting despite the defendant's knowledge that the sandblasting was performed in an unsafe

manner); *Kent v. Gulf States Utils. Co.*, 418 So.2d 493, 499 (La. 1982) (state agency did not owe

duty to employee of independent contractor who was injured while performing work on state

roadway even though agency's project engineer observed the employee using tools that

heightened risk for accident and "arguably could have prevented the accident" by demanding

that the contractor furnish different tools to its employee; agency "did not affirmatively create a

---

[7] Exxon did not come into corporate existence until 1973. R. Doc. 323 at 3. Presumably, Plaintiff is referring to Humble. *See* R. Doc. 356-4 at 6.

[8] Plaintiff's contention that Exxon had knowledge of the deleterious effects of asbestos by as early as 1949 is based on an affidavit from Dr. Richard Lemen. R. Doc. 356 at 8. In its reply, E&S move to strike the affidavit, arguing that Plaintiff is relying on an expert opinion and that this expert opinion that was not disclosed in accordance with Federal Rule of Civil Procedure 26 as Plaintiff did not produce an expert report for Dr. Lemen or offer him for deposition. R. Doc. 368 at 1-2. The Court need not resolve this dispute because, even if Dr. Lemen's view is credited, Plaintiff's argument still fails.

hazardous situation by requiring [the worker] to use dangerous equipment or methods"). Instead, the principal must affirmatively authorize the unsafe condition in order to be liable. *See Lopez*, No. CV 17-8977, 2020 WL 3668059, at *6. And authorization "requires some level of control over the performance of the unsafe work practice." *Id.* Absent such authorization by the principal, "it is the employer's duty to determine the best means by which to accomplish the employee's work, and the defendant premises owner ha[s] no duty to intercede with the performance of that work." *Id.* (quoting *Roach*, No. CV 2:12-3165, 2016 WL 1453074, at *4 (alterations omitted)).

In *Lopez*, this Court found that there was "no evidence that Exxon"—the principal—"imposed any requirements or conditions on the work performed by [the independent contractor's] employees." *Id.* "[I]n the absence of evidence that Exxon specifically recognized the risk with [the independent contractor's] work and authorized the unsafe practice," the Court held that "Exxon did not have a duty to the [the independent contractor's] employees under a theory of vicarious liability." *Id.*

Here, Plaintiff maintains that E&S essentially created the risk of Decedent's asbestos exposure. In support, Plaintiff cites a document that purportedly lists the Vessels' specifications as required by Humble. R. Doc. 399.[9] This document twice mentions asbestos—once in a list of

---

[9] It is unclear if this document pertains to one, some, or all of the Vessels that E&S commissioned. Also, E&S object to the Court's consideration of this document, arguing that it is not competent summary judgment evidence because it is unsworn, unauthenticated, and not attached to an affidavit. R. Doc. 405 at 2 (citing *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991)). But E&S rely on an outdated version of Rule 56(c). In 2010, the Rule was amended and under its present terms, "the touchstone for summary judgment evidence is whether the evidence is capable of 'being presented in a form that would be admissible' at trial." *Sherman v. Irwin*, No. CV 17-4061, 2019 WL 6716962, at *3 (E.D. La. Dec. 10, 2019), *aff'd*, No. 20-30012, 2021 WL 855821 (5th Cir. Mar. 5, 2021) (cleaned up). "'[T]he material may be presented in a form that would not, in itself, be admissible at trial.'" *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 521 (5th Cir. 2021) (quoting *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017)). Thus, the supposed deficiencies in Plaintiff's submission that E&S point to are immaterial. Indeed, the Court observe that E&S rely upon the Vessel Contracts, which they appear to have submitted in unauthenticated form and without being attached to an affidavit. In any event, the Court is of the view that the vessel specifications would likely be admissible under the business-records exception to

the items to be used in constructing the engine department and second in describing the materials to be used in covering the "deck surfaces in the messrooms, passageways and offices." *Id.* at 63, 93.[10] E&S argue that the specifications for the Vessel Contracts merely complied with Coast Guard regulations that prescribed the use of incombustible materials aboard vessels and that at least some of these Coast Guard-approved materials contained asbestos. R. Doc. 405 at 1-2; R. Doc. 407-1 at 14. But E&S do not cite any regulations supporting their contention. Nor do they appear to argue that all incombustible materials approved for use aboard vessels during the pertinent period necessarily contained asbestos. And even if E&S had no choice under the applicable regulations but to use asbestos-containing materials, E&S do not show how such a requirement would categorically absolve them of liability.[11]

In addition to specifying the use of asbestos in the construction of its Vessels, Plaintiff argues that E&S had knowledge of the risks of asbestos prior to Decedent's alleged exposure. Plaintiff relies on two depositions in the 1990s of Exxon's former Chief Industrial Hygienist and Director of Industrial Hygiene for Humble, Dr. James Hammond. In one deposition, Dr.

---

hearsay. *See* Fed. R. Evid. 803(6). Accordingly, the Court declines Plaintiff's request to strike the vessel specifications document from consideration.

[10] At the Court's request, Plaintiff submitted the vessel specifications following oral argument. The document is over 160 pages, and Plaintiff failed to specifically cite the portions mentioning asbestos. It is of course the duty of counsel, not the Court, to identify the portions of the record supporting counsel's argument. Similarly, Plaintiff claimed that the Vessel Contracts themselves require asbestos but failed to point to any particular portion substantiating this contention. The Court independently reviewed the Vessel Contracts and did not find any references to asbestos. Additionally, Plaintiff cites a document containing specifications from Hopeman Brothers to Humble Oil and Avondale" regarding Micarta wallboard to be installed on the ESSO SAN FRANCISCO. R. Doc. 397-2 at 2; R. Doc. 397-4. Although Plaintiff presupposes that Micarta contains asbestos, she fails to introduce any expert evidence on this point nor has Plaintiff suggested that the Court take judicial notice that Micarta contains asbestos.

[11] Notably, E&S do not argue that they are entitled to government contractor immunity, nor is it clear that it would be entitled to such a defense as Plaintiff's claims—as E&S itself repeatedly note—do not sound in design defect. *See Adams v. Eagle, Inc.*, No. CV 21-694, 2022 WL 4016749, at *7 (E.D. La. Sept. 2, 2022) ("The government contractor's compliance with the government specification on the product design would shield the contractor from any *design defect liability*. . . . But that is not the claim Plaintiff brings against Avondale. Plaintiff brings, *inter alia*, a failure to warn claim, and Avondale cannot demonstrate the existence of a government specification even remotely requiring Avondale to give or not to give its employees warnings." (internal footnoted omitted)).

Hammond stated that Humble was aware of the connection between asbestos exposure and mesothelioma by 1962, years before Decedent worked at Avondale Shipyards. R. Doc. 356-4 at 6, 20. During that deposition, Dr. Hammond also acknowledged that contractors were not necessarily informed by Humble about the risks of asbestos exposure or instructed on how to prevent exposure and how to safely handle asbestos. *Id.* at 20-27. In the second deposition, Dr. Hammond testified that the company knew that there was no safe level of exposure to asbestos by 1963 or 1964. R. Doc. 356-5 at 3.[12]

The Court finds that Plaintiff has succeeded in creating a fact issue as to whether E&S in effect affirmatively established an unsafe working condition that caused Decedent to be exposed to asbestos. Unlike in *Lopez*, there is "evidence that [E&S] specifically recognized the risk" of asbestos exposure. No. CV 17-8977, 2020 WL 3668059, at *6. And the evidence suggests that they nevertheless mandated asbestos-containing materials be used in the Vessels' construction

---

[12] Plaintiff also attaches two exhibits in an attempt to establish that E&S had knowledge of the deleterious effects of asbestos by as early as 1949. First is an affidavit by Dr. Richard Lemen, a private consultant and former Assistant Surgeon General of the United States, in case no. 2018-6835 in the Civil District Court for the Parish of Orleans. R. Doc. 356-2. The affidavit appears to be the state-law equivalent of the expert report requirement contained in Federal Rule of Civil Procedure 26 as it outlines Dr. Lemen's qualifications and his opinions regarding the disease-causing effects of asbestos. Plaintiff relies on a citation in the affidavit to an academic article by Dr. Lemen entitled "Epidemiology of Asbestos-Related Diseases and the Knowledge that Led to What is Known Today," which appeared as chapter 5 in "Asbestos, Risk Assessment, Epidemiology, and Health Effects – Second Edition," edited by Ronald F. Dodson and Samuel Hammar and published in 2011 by CRC Press Taylor & Francis Group. R. Doc. 356-2 at 6. Second, Plaintiff attaches the article itself. The article states that, in 1949, "the Standard Oil Company (New Jersey)," the predecessor of Exxon, issued a report that "discussed asbestos and its relationship to fibrosis and cancer of the lungs and identified various trades at risk, including brick masons and helpers, insulators, laborers, and pipe benders." R. Doc. 356-3 at 52.

In its reply, E&S move to strike the affidavit and book chapter from the summary-judgment record. E&S argue that Plaintiff is relying on an expert opinion and that this expert opinion was not disclosed in accordance with Federal Rule of Civil Procedure 26 because Plaintiff did not disclose Dr. Lemen as an expert on her witness list, did not produce an expert report for Dr. Lemen, and did not offer him for deposition. R. Doc. 368 at 1-2.

Insofar as E&S move to strike the affidavit, the Court grants the request because Plaintiff did not disclose the identity of Dr. Lemen as an expert or provide a written expert report and any purported expert disclosures are untimely. *See* Fed. R. Civ. P. 26(a)(2). On the other hand, the book chapter by Dr. Lemen is not subject to the expert disclosure requirements and may be admissible as a statement in a learned treatise under Federal Rule of Evidence 803(18), if an expert will rely upon it. Accordingly, E&S's request to strike the book chapter is denied. Regardless of E&S's request to strike exhibits related to Dr. Lemen, Plaintiff has still established a fact question regarding E&S's knowledge of the hazards of asbestos prior to Decedent's work at Avondale Shipyards based on testimony by Dr. Hammond.

without warning the general contractor or any subcontractors about the risks of asbestos or how to safely handle the substance.

Thus, notwithstanding the lack of evidence showing that E&S controlled how Avondale or its subcontractors actually handled the asbestos, a reasonable jury could find that E&S "create[d] a hazardous situation by requiring" the use of asbestos, a substance they knew to be dangerous, and then failing to warn about its risks and how to mitigate them. *Kent*, 418 So.2d at 500; *cf. Jefferson v. Cooper/T. Smith Corp.*, 2002-2136 (La. App. 4 Cir. 10/1/03), 858 So.2d 691, 695–96 ("[W]e conclude genuine issues of material fact exist as to whether the Dock Board knew or should have known of the dangers posed by asbestos at the time Mr. Jefferson was employed as a longshoreman, whether it knew or should have known that its facilities were inadequate for the handling and storage of asbestos on or in its premises, and whether it could have refused such hazardous cargo. The resolution of some or all of these unresolved issues is essential to the plaintiffs' cause of action in negligence[.]"). Accordingly, the Court finds that Plaintiff has minimally defeated summary judgment on her vicarious liability claim against E&S.

### ii. Direct Liability

"Although the independent contractor defense [generally] is a bar to a vicarious liability claim, it is not a bar to direct liability claim arising out of a premises-owner's own negligence." *Thomas*, 933 So.2d at 852. E&S argue that their predecessor Humble did not have a duty to warn Plaintiff, as an employee of an independent contractor, of risks inherent to his job. R. Doc. 325-2 at 15-16.

This Court has explained the duties owed by a premises owner to those on its property as follows:

> In general, a premises owner has a duty to protect persons on the premises from the unreasonable risk of harm. Although this duty extends to the employees of

independent contractors for whose benefit the owner must take reasonable steps to ensure a safe working environment, it does not require the owner or operator to intervene in and correct the work practices selected by an independent contractor. Rather, the existence of a duty of a principal to the employees of an independent contractor depends on whether the hazard was created by the principal or the independent contractor. Further, in a principal-independent contractor relationship, the principal does not owe a duty to protect the contractor's employees from risks inherent to the job. Essentially, while a premises owner may be directly liable for hazards inherent in the premises, the owner cannot be liable for hazards inherent in a contractor's job.

*Lopez*, No. CV 17-8977, 2020 WL 3668059, at *7 (internal citations and quotation marks omitted). In short, the issue of whether Humble owed a duty to Decedent turns on whether Humble created the hazard of being exposed to asbestos.

E&S argue that the risk of exposure to allegedly asbestos-containing materials was inherent to Decedent's job because such materials were present on all ships constructed at Avondale Shipyards during the late 1960s to early 1970s, not just the Vessels that its predecessor Humble contracted with Avondale to construct. R. Doc. 325-2 at 17. Therefore, according to E&S, the danger of inhaling asbestos fibers was simply part of Decedent's job as a pipefitter's helper at Avondale at this time and was not a risk that it created. In support, E&S offer testimony from a 1983 deposition of Burnette Bordelon, the former Superintendent of Insulation and Stud Welding at Avondale who stated that the company used asbestos insulation on ships until 1980. R. Doc. 325-20 at 4. E&S also present testimony from John Baker, a former vice president at Hopeman, who stated in a 1991 deposition that the company used asbestos when constructing vessels at Avondale Shipyard between 1965 to 1975. R. Doc. 325-2 at 17.

For the same reason that E&S are not entitled to summary judgment on Plaintiff's vicarious liability claim, they cannot be awarded summary judgment on Plaintiff's direct liability claim. The record raises fact issues as to whether E&S mandated the use of asbestos and failed to warn of its dangers or how to mitigate them. Because a jury could find that E&S created the risk

of asbestos exposure to Decedent and negligently failed to warn him of the risk of that risk, the Court must deny E&S's request for summary judgment on this claim.  *See Thomas*, 933 So.2d at 856-57 (affirming the jury's verdict that defendant "breached its duty as a premises owner" by exposing employees of an independent contractor to asbestos, "to the extent [that defendant] specified the use of asbestos containing products"); *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-366, 2015 WL 6758258, at *19 (E.D. La. Nov. 5, 2015) ("Although duty is a question of law, the Court finds that opposing parties have proffered sufficient evidence of a genuine issue of material fact that precludes summary judgment on whether [defendant] created a hazardous situation . . . and therefore was independently negligent."); *Cortez v. Lamorak Ins. Co.*, No. CV 20-2389, 2022 WL 3092859, at *10 (E.D. La. Aug. 3, 2022) (denying summary judgment on a direct liability claim where "there is evidence in the record that Cortez was exposed to asbestos because of Vulcan's actions in specifying the use of asbestos-containing gaskets and insulation, and providing asbestos gaskets to pipefitters like Cortez").

### B. Strict Liability

Under the version of article 2317 in effect at the time of Decedent's alleged exposure,[13] the codal provision imposed strict liability for damage caused by "things which we have in our custody." A plaintiff must prove the following to prevail on such a claim: (1) that the defendant had "garde"—that is, care, custody, and control—over the damage-causing thing; (2) the thing had a vice or defect that created an unreasonable risk of harm; and (3) the plaintiff's injuries were caused by the vice or defect. *Lopez*, No. CV 17-8977, 2020 WL 3668059, at *7.

---

[13] "In cases involving long-latency occupational diseases such as mesothelioma, the court must apply the law in effect at the time of the exposure," which in this case is the version of article 2317 that mandates strict liability. *Lopez*, No. CV 17-8977, 2020 WL 3668059, at *7 n.2 (quoting *Watts v. Georgia-Pac. Corp.*, 2012-0620 (La. App. 1 Cir. 9/16/13), 135 So. 3d 53, 59). The statute was amended in 1996; strict liability was eliminated and replaced with a negligence standard. Act No. 1, 1996 La. Sess. Law Serv. 1st Ex. Sess. (H.B. 18).

Garde for purposes of strict liability concerns "the right of supervision, direction, and control as well as the right to benefit from the thing controlled." *Id.* at *8 (quoting *Haydel v. Hercules Transp., Inc.*, 94-0016 (La. App. 1 Cir. 4/7/95), 654 So.2d 408, 414).

Ownership creates a presumption of custody. *Cortez*, No. CV 20-2389, 2022 WL 3092859, at *11. However, that presumption "may be rebutted 'by showing that the owner (1) did not receive a substantial benefit from ownership nor (2) had any control or authority over the object.'" *Id.* (cleaned up) (quoting *Royer v. Citgo Pet. Corp.*, 53 F.3d 116, 119 (5th Cir. 1995)).

In addition, "an owner of a [premises] under construction" generally "does not have custody for purposes of liability under Article 2317." *Covey v. Seifert*, No. CV 18-99, 2019 WL 303008, at *9 (M.D. La. Jan. 23, 2019) (cleaned up) (quoting *Young v. City of Plaquemine*, 2002-0280 (La. App. 1 Cir. 5/10/02), 818 So.2d 898, 899). But this rule is subject to the same exceptions that apply to the independent-contractor defense discussed above: namely, that an owner of a premises under construction is deemed to have garde "when the owner exercises operational control over the contractor's methods of operation or gives express or implied authorization to unsafe practices." *Id.* (quoting *Young*, 818 So.2d at 899); *accord Falcon v. Surcouf*, 17-212 (La. App. 5 Cir. 12/27/17), 236 So. 3d 716, 725.[14]

Notably, the Louisiana Supreme Court has explained that because garde is a much broader concept than ownership, "it is clear that more than one party may have custody or garde of a thing under" article 2317. *Dupree v. City of New Orleans*, 1999-3651 (La. 8/31/00), 765 So.2d 1002, 1009. Ultimately, garde is a fact-intensive inquiry, and as such, is generally an issue

---

[14] Although these cases post-date the amendment to article 2317, there is no indication that these exceptions were part of the statutory revisions. Put another way, these exceptions existed under the version of article 2317 in effect at the pertinent time here—the period when Decedent was allegedly exposed to asbestos.

that is left for the jury to resolve. *Royer v. Citgo Petroleum Corp*., 53 F.3d 116, 119 (5th Cir. 1995)

As an initial matter, there is an issue as to what is the damage-causing "thing" that E&S purportedly had custody of under article 2317: is the "thing" the asbestos that Decedent was allegedly exposed to, or, as the parties assume, the Vessels that Decedent worked in? R. Doc. 325-2 at 18-19; R. Doc. 356 at 3-5; *see also Smith v. Union Carbide Corp.*, No. CIV.A. 13-6323, 2014 WL 4930457, at *6 (E.D. La. Oct. 1, 2014) (noting similar issue with respect to whether the "thing" in question was "Defendants' premises generally or the asbestos use in those facilities more specifically"). In this sort of situation, it appears that, in general, courts deem the damage-causing thing to be the asbestos rather than the surrounding premises that may contain the asbestos. *See, e.g.*, *Lopez*, No. CV 17-8977, 2020 WL 3668059, at *8; *Cortez*, No. CV 20-2389, 2022 WL 3092859, at *11. Here, the Court need not decide whether the "thing" is the asbestos or the Vessels because the analysis and the result are the same either way: fact issues exist as to whether E&S had garde over the thing.

Assuming that the injury-causing thing is the asbestos that Decedent was allegedly exposed to, a reasonable jury could find that E&S had custody over this asbestos. First, as mentioned, there are fact issues as to E&S's ownership over the Vessels—and this includes the asbestos that is a component of the Vessels. This case is therefore distinguishable from *Smith v. Union Carbide Corporation*—which E&S rely upon—because in that case there was "no[] dispute" that the owner of a chemical plant lacked "ownership of the asbestos at the time of installation," which was when the victim was allegedly exposed to the asbestos. No. CIV.A. 13-6323, 2014 WL 4930457, at *6. And E&S have not sufficiently rebutted the presumption of custody that ownership establishes. Indeed, E&S have not even attempted to argue that they did

not reap any benefit from ownership over the asbestos that was used to construct their Vessels. *See Cortez*, No. CV 20-2389, 2022 WL 3092859, at *1. Of course, it would be difficult for E&S to contend that they did not receive any benefit from using asbestos when they claim elsewhere in their briefing that they specified the use of asbestos in the construction of their Vessels in order to satisfy Coast Guard regulations that required the use of incombustible materials. A company clearly benefits from owning a material where that material enables its vessels to meet regulatory standards.

Furthermore, even though other entities—such as Avondale and/or Hopeman—may have exercised garde over the asbestos, that circumstance in no way precludes E&S from also having had garde. *See Dupree*, 765 So.2d at 1009. Finally, E&S's contractual requirement that asbestos-containing materials be used in the construction of its Vessels could be deemed authorizing— indeed, mandating—an unsafe practice. *See Covey*, No. CV 18-99, 2019 WL 303008, at *9 (denying summary judgment on a claim under article 2317 because "there is enough to establish a question of fact on the Defendants' custody of control over the shed[; a] reasonable jury could conclude that she authorized the unsafe practices"). Accordingly, there are genuine questions of fact as to whether E&S had garde over the asbestos.

The same result obtains if the Vessels are the damage-causing thing. The parties debate whether Decedent may have worked on the Vessels *after* they were delivered to E&S. R. Doc. 325-2 at 12-15; R. Doc. 356 at 3-5. At that juncture, the parties appear to agree that E&S exercised custody over the Vessels. However, as discussed, the summary-judgment evidence indicates that E&S required that asbestos be used in the construction of its Vessels. Obviously, the construction of the Vessels occurred prior to their delivery. A jury could find, then, that E&S had custody and control over the Vessels before their delivery because E&S required an unsafe

work practice, *i.e.*, the use of asbestos. Thus, regardless as to whether Decedent worked on any E&S vessel after its delivery, fact issues exist as to E&S's custody over the Vessels during the period when they were under construction at Avondale Shipyards.

In sum, fact issues preclude summary judgment on Plaintiff's strict liability claim under article 2317.

## V.   CONCLUSION

For these reasons,

**IT IS ORDERED** that SeaRiver's motion for summary judgment, R. Doc. 325, is **DENIED**.

New Orleans, Louisiana, this 23rd day of September, 2022.

_____
**UNITED STATES DISTRICT JUDGE**